IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JESUS VEGA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:14-cv-1396-NJR-DGW |
| | ) |
| MICHAEL ATCHISON, | ) |
| RICHARD HARRINGTON, | ) |
| BARBARA MUELLER, | ) |
| CHAD HASEMEYER, | ) |
| KIMBERLY BUTLER, | ) |
| S.A. GODINEZ, and | ) |
| JOHN BALDWIN, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Now pending before the Court is a fully briefed Motion for Summary Judgment filed by all Defendants on October 6, 2017 (*see* Docs. 118, 124). For the reasons set forth below, the Motion is granted in part and denied in part.

### BACKGROUND

Plaintiff Jesus Vega is proceeding on two counts related to placement in the Administrative Detention Unit ("ADU") at Menard Correctional Center from November 2012 to December 2015 (Doc. 82). He claims that he was placed in the ADU without any due process, that his continued placement in the ADU also was without due process, and that he was subjected to unconstitutional conditions of confinement in the ADU.

## A. Vega's Placement in the ADU

Administrative detention is defined by state regulation as "a nondisciplinary status of confinement which removes an offender from general population or restricts the individual's access to general population" (Doc. 124, ¶4; Doc. 124-9). Defendant Kimberly Butler, the former Assistant Warden and Warden at Menard, testified that inmates were placed in the ADU if they were identified as being a threat to the safety of the facility, which usually occurred if the inmate was involved in a security threat group ("STG") (*i.e.*, gang) or involved in assaulting other offenders or staff (Doc. 119, ¶3). The warden, with the approval of the Director, Deputy Director, or Assistant Deputy Director, was authorized to place an inmate in administrative detention for up to ninety days (Doc. 124-9). Placement was reviewed every ninety days to determine whether continued placement in the ADU was appropriate (Doc. 119, ¶7).

Defendants freely admit that no process was provided to inmates prior to their placement in the ADU at Menard (Doc. 119, ¶4; Doc. 124, ¶5). There was no hearing, and inmates were not told why they were placed in the ADU (Doc. 124, ¶5). The reason for the placement, if any, was not documented in any way (*Id.*). For the periodic reviews, state regulations did not require a hearing or an interview with the inmate; they required only that the warden "review the record" of every inmate in the ADU (Doc. 124, ¶12; Doc. 124-9). Defendant Butler testified that the only way for an inmate to challenge his placement was through the grievance process (Doc. 124, ¶5; Doc. 119-5, p. 50). She acknowledged, however, that if an inmate filed a grievance regarding his placement in the ADU, he was commonly told the issue was "nongrievable," and she did not know of any inmate who ever successfully challenged his placement (Doc. 124, ¶¶5, 38).

Vega was incarcerated at Stateville Correctional Center, where he was housed in general population, from 2006 until November 1, 2012, at which time he was transferred to Menard and placed in the ADU by Michael Atchison, the warden at Menard at the time (Doc. 124, ¶6; Doc. 119, ¶2; Doc. 119-4, p. 1). Vega was not told why he was placed in the ADU, and no reason was listed on the document directing Vega's placement in the ADU (Doc. 124, ¶7; Doc. 119-4, p. 1).

Nine days after arriving in the ADU, Vega received a disciplinary ticket for "104 Dangerous Contraband" (Doc. 119-3). His "Disciplinary Card" indicates that he had "6 3/8 in. home made weapon, SEWING NEEDLE" (*Id.*). Vega was found guilty and punished with one-year of disciplinary segregation, a change in his security grade, and commissary restriction (*Id.*). Because Vega was already in the ADU, receiving disciplinary segregation simply meant a change in designation, and he served his disciplinary segregation in the same ADU cell in which he served his administrative detention (Doc. 119-1, p. 13).

Vega's placement in the ADU was first reviewed on February 1, 2013, by Defendant Richard Harrington, who had replaced Atchison as the Warden at Menard, and Vega's administrative detention was continued (Doc. 119-4, ¶8; Doc. 119-4, p. 2). (*see* Doc. 119-4, p. 2).[1] Harrington testified at a deposition that, as Warden, he had no ability to decide whether an inmate should or should not remain in the ADU (Doc. 124, ¶13; Doc. 124-2, p. 5). He believed that he could not place an inmate in the ADU or authorize a release from the ADU without permission from his superiors (Doc. 119, at ¶13; Doc. 124-2, p. 8). He testified that he had "no idea" why the Illinois Department of Corrections ("IDOC") leadership in Springfield had him go through the process of signing the review forms and stated "[i]t is a

---
[1] There are no records from this periodic review (*see* Doc. 119-4).

part of a procedure that Springfield had in place so we had to sign it." (Doc. 124-2, p. 8). However, S.A. Godinez, the Director of the IDOC, testified that he would be surprised if any Warden did not know that he had the authority to either place someone in the ADU or retain him there (Doc. 124-3, p. 5).

Harrington also conducted the reviews that took place on May 1, August 1, and November 1, 2013 (*see* Doc. 119-4). At each review, Vega's placement in the ADU was continued, and the reasons provided were "Remain in AD on seg status," "Remain in AD, currently seg status until 11/10/2013," and "currently on segregation status until 11/10/2013" (*Id.* at pp. 6–8). On November 8, 2013, Vega was released from segregation status to "AD Phase 1" (*Id.* at p. 5). There is no indication of how Phase 1 differed from segregation status.[2]

In December 20, 2013, while on Phase 1, Vega received a disciplinary ticket for "211 Pos. or Sol. of U/A Personal Information" and "310 Abuse of Privileges" for using another inmate's ID number (Doc. 119-3). He was put back on segregation status for another three months (*Id.*). At the periodic review conducted on February 1, 2014, Vega's placement in the ADU was continued, and the reason given was "currently segregation status" (Doc. 119-4, p. 4).

Vega repeatedly filed grievances about being placed and retained in the ADU without any explanation (*see, e.g.,* Doc. 124-5, pp. 1–4, 8–13, 20–21). Defendant Barbara Mueller, a correctional counselor at Menard, responded to Vega's grievances (Doc. 124, ¶¶38, 39). In one response, she stated "You claim IDOC has become judge, jury, and

---

[2] Vega submitted an administrative directive issued on May 1, 2014, that delineates the different privileges afforded to inmates in Phases 1, 2, and 3 (Doc. 124-10). There is no evidence as to whether that same description of Phases 1, 2, and 3 applied prior to May 2014.

executioner. We haven't executed anyone in Admin. Detention program. This is an Administrative placement and as such is not grievable" (*Id.*; Doc. 124-5, p. 20). In another response, she stated "You have the right to ask. We have the right to deny answers to your questions" (Doc. 124, ¶¶38, 39; Doc. 124-5, p. 20). Vega's grievances were denied, and he did not get any answers regarding his ADU placement through the grievance process (Doc. 124, ¶¶38, 39).

Things came to a head in 2014, when Vega and approximately twenty other inmates in Menard's ADU went on a mass hunger strike to protest the restrictions imposed upon them and the fact that there was no process by which they could get out of the ADU (Doc. 124, ¶41). Director Godinez toured the ADU at Menard in March 2014, and Vega asked Godinez why he had been placed in administrative detention (Doc. 124, ¶41; *see* Doc. 119-6, ¶5; Doc. 119-7). Director Godinez wrote to Vega the next month and told him that it was because he had "received 100, 200, & 300 series tickets, [his] identified involvement as a security threat group leader, and [his] continued communication with a known security group" (Doc. 119-7).

According to Vega, however, none of those reasons are true (Doc. 124, ¶42). Prior to his transfer to the ADU, Vega did not have the types of tickets listed in the letter; they were issued only after his placement in the ADU (*Id.*; *see* Doc. 119-3). Vega also denies that he was the leader of a gang or on a "hit squad" (Doc. 124, ¶46). His testimony seems to be corroborated by the fact that he never received any tickets for gang-related activities or for being a gang leader (*Id.* at ¶47). Defendant Godinez admitted at his deposition that he does not know how he concluded that Vega was an STG leader and does not know how Vega, who had been housed in the ADU and segregated from other inmates, could have been in

continued communication with a known STG (*Id.* at ¶43). Furthermore, the administrative detention review forms from May 2013 to May 2014 all indicated that no gang activity had been noted while Vega was in the ADU (*Id.* at ¶43).

On May 1, 2014, Vega's placement in the ADU was once again reviewed and continued without a hearing (Doc. 119, p. 3). In the space labeled "Reason for Recommendation," the committee chairperson wrote "Move from Phase 1 to Phase 2" (Doc. 119-4, p. 3). This review was signed off on by Kimberly Butler, who had replaced Richard Harrington as the Warden at Menard in April 2014 (*see* Doc. 119-4, p. 3).

Also on May 1, 2014, IDOC issued an administrative directive to "establish written procedures for staff to govern the placement and supervision of offenders in administrative detention" (Doc. 124, ¶44; Doc. 124-10). The new directive required IDOC officials to document administrative detention placement decisions, to hold review committee hearings within thirty days of placement, to review placement determinations every ninety days, and to provide inmates with written notice "of the date of the Committee hearing and, with reasonable specificity the Department's justification for placement at least five working days prior to the hearing" (Doc. 124-10). The directive also provided that the Committee should be composed of certain individuals, and that in making the placement recommendations and decisions, the Committee must consider, at a minimum, disciplinary reports, initial administrative detention placement documents, updated intelligence activity related to the safety and security of the facility, mental health evaluations, and oral or written statements from the inmate (*Id.*).

Vega's next review occurred on July 29, 2014 (Doc. 120, p. 6). This review is when Vega received his first hearing—*over 600 days* after being placed in the ADU (Doc. 124, ¶45).

Vega was informed before the hearing that he was placed in the ADU because he was identified as the leader of the Latin Kings gang at Stateville and that he was "part of a hit squad" (Doc. 119, ¶12; Doc. 120, p. 1). The review form notes that Vega had not received any disciplinary tickets since the last review (Doc. 120, p. 6). His placement in the ADU was continued at this review, and in the section of the review form where the committee was supposed to provide a justification for continuing administrative detention, it was written "Move from phase 2 to phase 3 for continued observation" (*Id.*).

Subsequent periodic reviews were conducted on October 23, 2014 and January 15, 2015 (Doc. 120, pp. 9, 14). At each review, it was noted that Vega had not received any disciplinary tickets since the last review and he had not been placed in segregation since December 2013 (*Id.*). Vega's placement in the ADU was continued, and the justification section of the October review form indicated "continue phase 3 on front N2-7 gallery for further observation" (*Id.*). The justification section of the January review form was left blank (*Id.*). Warden Butler and the Director of the IDOC (or deputy director) both signed off on the January review (*Id.*).

Two months later, on March 17, 2015, Vega received another disciplinary ticket for "304 Insolence" and "308 Contraband/Unauthorized property" because of a "verbal altercation with staff [and] excess extension cords" (Doc. 120, p. 20). He was given one month in segregation, and released to Phase 1 of administrative detention on April 17, 2015 (*Id.* at pp. 20, 30). The next review of his placement in the ADU occurred less than one month later on May 8, 2015, and his placement was continued (*see id.* at p. 30).[3] At the next review on July 9, 2015, it was noted that Vega had not received any disciplinary tickets since the last

---

[3] There are no records from this periodic review (*see* Doc. 120).

review and his most recent segregation placement was approximately four months prior (*Id.*). Vega's placement in the ADU was continued and the justification section was left blank, but he was apparently moved from Phase 1 to Phase 2 of administrative detention (*see id.* at pp. 30, 33).

At the review on September 22, 2015, it was once again noted that Vega had not received any disciplinary tickets since the last review and his most recent segregation placement was approximately six months prior (Doc. 120, p. 33). It was further noted that Vega "denied ever being affiliated with an STG and has no safety concerns if released into [general population" (*Id.*). Vega's placement in the ADU was continued but he was moved from Phase 2 to Phase 3 because he had "no issues during Phase 2" (*Id.*). Warden Butler did not sign off on the review form until over a month later on October 28, 2015, and the Director of the IDOC (or the deputy director) signed off on it on November 2, 2015 (*Id.*).

Interestingly, before Warden Butler and the Director ever signed the September review form, another review was held on October 9, 2015 (Doc. 120, p. 37). At the October review, the committee recommended that Vega be returned to general population (*Id.*). Warden Butler concurred with the recommendation on October 16, 2015, and the IDOC Director concurred approximately one week later (*Id.* at pp. 37, 38).[4] In other words, Butler and the Director signed the review form for the October review releasing Vega from administrative detention almost two weeks before they signed the review form for the previous hearing held in September. Vega was released from the ADU in December 2015 (Doc. 124, ¶50), after spending approximately 37 months in administrative detention.

---

[4] There are two Administrative Detention Review forms from the October 9th hearing. On the first, the Director's signature is dated October 23, 2015 (Doc. 120, p. 37). On the second, the Director's signature is dated October 27, 2015 (*Id.* at Doc. 38). No explanation for the discrepancy was given.

## B. Conditions in the ADU

Vega testified that during his time in the ADU, he was housed in a cell behind a solid steel door with a small glass window (Doc. 124, ¶16). When he first arrived in the ADU, he did not have a cellmate and could not communicate with any other inmates because of the steel door on his cell (*Id.*).[5] While in the ADU, Vega was confined to his cell twenty-four hours a day, except for five hours a week when he was allowed onto the yard. He ate every meal in his cell and was no longer allowed to go to chow with other inmates (*Id.*). He was allowed only one shower a week outside of his cell (*Id.*). He was not permitted to go to the commissary and could purchase only limited items for delivery to his cell (*Id.*). He could not go to the law library, to Bible study, to any classes or programs, or hold a job (*Id.*). He could not control the light in his cell (*Id.*) He was no longer allowed access to property items such as his electronic devices (television, radio, and shaver), audio tapes, and extra clothing and shoes, and he had access to a limited number of books and magazines (*Id.*).

Vega testified that the ADU was infested with mice (Doc. 124, ¶18; Doc. 119-1, p. 10). He said he saw mice at least twice a week while housed on the B and C wing, and he even killed some with a shoe (Doc. 119-1, p. 14). Vega kept his cell clean, but the gallery outside was not cleaned, and dust, hair, and bugs would come into his cell underneath the door (*Id.* at p. 15). The bugs included spiders, cockroaches, and mosquitos, but they did not come into his cell "that often" (*Id.*).

Vega's cell also lacked hot water from November 2012 to October 2013 (Doc. 124, ¶22). He was not able to take a hot water shower as the water would fluctuate between

---

[5] At some point, Vega had a cellmate in the ADU, but he could not recall when (Doc. 119-1, p. 3). Defendants apparently did not produce any records with Vega's cell assignment and cellmate history.

"kind of warm" and cold (Doc. 119-1, p. 10–11). For much of that same time period—from the time he was placed in the ADU in November 2012 until the spring of 2013—as well as during the next winter, the heat in his cell was not working properly (Doc. 124, ¶19). A Menard physical plant services work order dated October 31, 2012 confirmed that "B wing in North II has no heat or hot water," and "C wing has no hot water" (Doc. 124, ¶32).

When Vega arrived in the ADU, he had only his regular clothes, one blanket, and a hat (Doc. 119, ¶23; Doc. 119-1, p. 12). He did not have a coat, gloves, or long underwear (*Id.*). After he complained about the cold, he was given his sweatpants and sweatshirt (*Id.*). He also was given a plastic bag to tape over his window (*Id.* at p. 14). He was not allowed to purchase extra clothing (Doc. 124, ¶19). As a result of the lack of hot water and adequate heating, Vega was not able to keep warm during the winter and suffered headaches and head colds (*Id.* at ¶20). He also suffered from anxiety and panic attacks for which he sought mental health care (*Id.* at ¶49).

Defendant Mueller testified that she received "hundreds" of grievances about both the lack of heat and the lack of hot water (Doc. 124, ¶29; Doc. 124-1, pp. 5–6). Vega himself submitted four grievances, in December 2012, January 2013, March 2013, and May 2013, about the lack of heat or hot water (Doc. 124, ¶¶34-37). The responses he received were signed by Defendant Butler and/or Defendant Mueller (*Id.*). In one of the responses, Mueller stated, "You have a right to have water. Page 24 of the orientation manual states each cell shall be furnished with a wash basin with running water and flushable toilets. You have water in your cell" (*Id.* at ¶31). In a response to another inmate's grievance, Mueller stated "The pioneers showered, bathed and shaved in the cold without heat. They had no hot water. Currently maintenance is working on your complaints" (*Id.* at ¶30). Mueller also

made "flip" comments about the heating problems in the ADU, as did Defendant Chad Hasemeyer (a shift commander at Menard) in a January 2013 staff email between Atchison, Harrington, Butler, Hasemeyer, and Mueller (*Id.* at ¶31). Atchison testified that, based on the notations on the October 2012 Work Order, it was "a reasonable assumption" that the heat and hot water issues were reported in October 2012 but not resolved until May 2013 (*Id.* at ¶32).

## DISCUSSION

Summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, "[a] court may not . . . choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted).

### A. Count 1: Due Process

> The Due Process Clause of the Fourteenth Amendment applies only to deprivations of life, liberty, and property. Otherwise states are free to act summarily. We undertake a two-part analysis in procedural due-process cases: first, we determine whether the plaintiff was deprived of a protected interest; if so, we determine what process was due under the circumstances.

*Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) (quotation marks and citations omitted).

With respect to the first element, a protected liberty interest only exists when prison officials restrain the freedom of inmates in a manner that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "Prisoners do not have a constitutional right to remain in the general population; but both the duration and the conditions of the segregation must be considered in determining whether due process is implicated." *Isby*, 856 F.3d at 524.

Here, the evidence shows that Vega was confined for just over three years in a dirty cell, which also lacked adequate heat and hot water for a period of at least six months, in almost total isolation with little to no human contact for approximately twenty-three hours per day. Defendants do not make any argument as to whether the duration and conditions of Vega's confinement gave rise to a protected liberty interest (*see* Doc. 119). Based on the lack of argument, the extended length of Vega's stint in the ADU, and his undisputed testimony concerning the conditions of his confinement, the Court concludes that Vega's placement in the ADU imposed an atypical and significant hardship within the correctional context. *See Wilkinson v. Austin*, 545 U.S. 209, 223–24 (2005); *Isby*, 856 F.3d at 524.

The Court turns next to the issue of what process was due to Vega. Defendants mistakenly believe that "the initial placement [in administrative detention] does not require any procedural due process" (Doc. 119, p. 8). In *Hewitt v. Helms*, however, the Supreme Court plainly instructed that an inmate confined to administrative detention was entitled to "informal, nonadversary" due process. 459 U.S. 460, 474 (1983) (cited by *Isby*, 856 F.3d at 524–25; *accord Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017); *Westefer v. Neal*, 682 F.3d 679, 684–86 (7th Cir. 2012). That means, within a "reasonable time" of his placement in administrative detention, the inmate must be given "some notice of the reasons for [his]

placement" and "an opportunity to present his views" to the prison official who decided to place him in administrative detention. *Hewitt*, 459 U.S. at 476; *Westefer*, 682 F.3d at 684 (citations and internal quotation marks omitted).

Here, it is undisputed that Vega received no process whatsoever when he was initially placed in the ADU. Specifically, he was not told why he was placed in the ADU for over 500 days, until April 2014 when he got the letter from Godinez. Vega also was not given a chance to explain his side of the story for over 600 days, until July 2014 when he had his first Committee hearing. Both time periods quite plainly exceed all boundaries of reasonableness.

*Hewitt* further instructs that prison officials are required to "engage in some sort of periodic review" of the placement determination to verify that the inmate "remains a security risk." *Hewitt*, 459 U.S. at 477 n.9; *Westefer*, 682 F.3d 679. The periodic reviews can also be "informal and nonadversary" but they "must still be meaningful and non-pretextual." *Westefer*, 682 F.3d at 686; *Isby*, 86 F.3d at 527. *See also Toevs v. Reid*, 685 F.3d 903, 912 (3d Cir. 2012) ("The [periodic] review need not be extensive . . . [b]ut the review must be meaningful; it cannot be a sham or a pretext.") (citations omitted). "[A] meaningful review . . . is one that evaluates the prisoner's current circumstances and future prospects, and, considering the reason(s) for his confinement to the program, determines whether that placement remains warranted." *Isby*, 856 F.3d at 527 (quoting *Toevs*, 685 F.3d at 913 (internal quotation marks omitted)).

Vega has presented evidence from which a jury could conclude that the reviews were not constitutionally meaningful. There is little to no evidence of what the periodic reviews entailed prior to July 2014. It is unclear what standard, if any, was used to evaluate Vega.

The forms filled out for each periodic review provide only uninformative, boilerplate reasons for continuing Vega's placement in the ADU, such as "move from phase 1 to phase 2" (*see* Doc. 119-4, pp. 3–8). It does not appear that Vega was ever given any explanation after a review occurred as to why his placement was continued or how he could get out of the ADU. And Warden Harrington's testimony, when viewed in a light most favorable to Vega, could be viewed as an admission that he was simply going through the motions of the review and rubber-stamping the committee's decision. As such, there is a genuine issue as to whether the periodic reviews prior to July 2014 were anything more than "hollow formalities." *Proctor v. LeClaire*, 846 F.3d 597, 612 (2d Cir. 2017).

Vega concedes that he had a hearing in July 2014, a few months after Butler became Warden. At that time, and for each subsequent review, Vega was told in writing that his continued placement in the ADU was because he was identified as a leader of a gang and part of a "hit squad" (Doc. 120). There is evidence that calls into question whether these reasons are true. He insists that he wasn't. He also points to the fact that he never received a ticket for gang activity. And none of the periodic review forms indicate that any gang-related activity was observed after Vega was placed in the ADU. While it may be true that Vega was a gang leader and responsible for attacks on other inmates or staff, such information is not borne out by the evidence that is currently before the Court. Furthermore, the reasons given for continuing Vega's administrative detention—if a reason was provided at all—continued to be uninformative, boilerplate statements. There was no explanation why continued placement was necessary or any indication that Vega was told how he could out of the ADU.

Given the length of his administrative detention, the conflicting evidence as to the reasons for it, and the repeated continuance of detention with only boilerplate language or no justification at all, there is a genuine issue of fact as to whether Vega's periodic reviews were actual, meaningful reviews—".*i.e.*, one open to the possibility of a different outcome"—or a pretext to keep him in confined in segregation indefinitely. *Isby*, 856 F.3d at 528. Thus, Defendant Atchison, the Warden who placed Vega in the ADU without any due process, and Defendants Harrington and Butler, the Wardens who repeatedly continued Vega's administrative detention despite the potential due process violations outlined above, are not entitled to summary judgment on Count 1.

Defendant Godinez is also not entitled to summary judgment on Count 1. It is undisputed that Vega complained to Godinez that he had been placed in the ADU without explanation, and therefore Godinez had reason to believe that Vega was being kept in the ADU without the benefit of constitutionally required due process. It is also undisputed that Godinez had the authority to review Vega's ADU placement and even to release him. But the only action Godinez took was to send Vega a letter providing reasons why Vega was placed in the ADU. And, for reasons described elsewhere in this Order, a reasonable jury could find the letter to be pretextual. Consequently, there is an issue of fact as to whether Godinez was personally involved with the alleged due process violation. *See Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) ("To succeed on a claim for supervisory liability, a plaintiff must show that the supervisor was personally involved in the constitutional violation . . . [meaning] the supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see.") (internal citation and quotation marks omitted).

As for Defendant Mueller, Vega complained to her on a weekly basis about his placement in the ADU, and she essentially told him that it was an administrative decision (Doc. 119-1, p. 17). Vega also complained to Major Hasemeyer when he saw him on the wing, and Vega was told that "Stateville sent me here and put me in AD" (*Id.* at pp. 17-18). Mueller and Hasemeyer argue, however, that they had no personal involvement in Vega's placement in the ADU (Doc. 119). It appears to be undisputed that Vega's initial placement and continued retention in the ADU were decisions made by the Warden and Directors within the IDOC, all of whom are Defendant Mueller and Hasemeyer's superiors. Their lack of any involvement in Vega's placement in ADU and their apparent inability to effect such a placement means that they are entitled to judgment on Count 1. *See Owens v. Evans*, 878 F.3d 559, 564 (7th Cir. 2017) ("Prison officials who simply processed or reviewed inmate grievances lack personal involvement in the conduct forming the basis of the grievance.")

In sum, summary judgment in granted in favor of Defendants Hasemeyer and Mueller on Count 1 and denied as to all other Defendants, including Defendant Baldwin who is only sued in his official capacity in order to perfect injunctive relief.

## B. Count 2: Conditions of Confinement

Prison officials violate the Eighth Amendment "if they are deliberately indifferent to adverse conditions that deny 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, recreation, and medical care." *Budd v. Motley*, 711 F.3d 840, 842 (7th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The Seventh Circuit has identified several situations that meet this demanding standard, including the lack of heat. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016). The lack of heat, in and of itself, can violate the Eighth Amendment, particularly when the inmate is given alternative means to

combat the cold that are inadequate and the cold persists for months. *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997).

The Court must first evaluate whether the conditions that Vega endured in the ADU were, from an objective standpoint, sufficiently serious that they resulted "in the denial of the minimal civilized measure of life's necessities." *Gray*, 826 F.3d at 1005. Vega testified that he was subjected to two winters without heat. He had only his regular clothes, a sweatsuit, a single blanket, and a hat. He was given a plastic bag to tape over his window. Vega testified these items were not enough to stay warm when he was confined for twenty-three hours a day in his cell behind a solid steel door with no air circulation and a vent that did not blow air, and the cold persisted day after day for months on end. Vega further testified that he had no hot water in his cell for much of the time that he was without heat. Vega testified that the ADU had mice and that he also battled spiders, cockroaches, and mosquitoes. This evidence, viewed in a light most favorable to Vega, establishes a dispute of fact as to whether the conditions Vega faced, particularly the cold and the length of time he had to endure it, were sufficient to violate the Eighth Amendment.

Summary judgment might still be proper, however, if Vega cannot show that Defendants acted with deliberate indifference. Defendants argue that Godinez and Baldwin lack sufficient personal involvement in the conditions of Vega's confinement. The Court agrees that there is no evidence that Godinez was personally involved in the conditions of Vega's confinement, that Vega ever relayed information about the conditions to him, or that he had some other reason to know about the conditions. As to Baldwin, Vega has made clear that he is retained in this suit for injunctive relief purposes only. Defendants do not squarely address whether Harrington, Butler, Mueller, and Hasemeyer were personally involved in

the deprivations. But the evidence reveals that Vega complained to each of them and, while they may have said they would look into the matter, nothing was done to alleviate the heating problem or hot water problem for months. Based on the lack of argument and the record, summary judgment cannot be granted to Defendants Harrington, Butler, Mueller, and Hasemeyer on Count 2.

In sum, judgment is granted in favor of Godinez on Count 2 and denied as to all other Defendants.

## C. Qualified Immunity

In light of the conclusion that some Defendants are not entitled to summary judgment on Counts 1 and 2, the Court must consider their argument that they are protected by qualified immunity.

"Generally, qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In determining whether Defendants are entitled to qualified immunity, the Court must ask two questions: (1) whether the facts, taken in the light most favorable to Vega, show that Defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Hernandez*, 634 F.3d at 914 (citing *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001)).

The Court has already determined that Vega put forth evidence sufficient to establish a genuine issue of fact as to whether his due process rights and his Eighth Amendment right to constitutional conditions of confinement were violated. The only remaining issue is whether those were clearly established. With respect to Count 1, "prison officials have been on notice since *Hewitt* that periodic reviews of administrative segregation are constitutionally required, and it is self-evident that they cannot be a sham." *Isby*, 856 F.3d at 530 (citing *Hewitt v. Helms*, 459 U.S. 460 (1983)). Prison officials have likewise been on notice since *Hewitt* that inmates have certain due process rights relative to the initial placement decision. *Hewitt*, 459 U.S. at 476. Consequently, Defendants are not entitled to qualified immunity on Count 1. As for Count 2, it is well established that prisoners have a right to adequate shelter, particularly protection from extreme cold. *See, e.g., Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997); *Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir. 1991). Consequently, Defendants are not entitled to qualified immunity on Count 2.

## Conclusion

For the reasons set forth above, the Motion for Summary Judgment filed by Defendants on October 6, 2017 (Doc. 118) is **GRANTED in part and DENIED in part**.

Judgment is **GRANTED** in favor of Defendants Hasemeyer and Mueller on Count 1 and **DENIED** as to all other Defendants. Judgment is also **GRANTED** in favor of Defendant Godinez on Count 2 and **DENIED** as to all other Defendants. Summary judgment is **DENIED** on the issue of qualified immunity.

This matter shall proceed to trial on Count 1 for violation of due process against Defendants Michael Atchison, Richard Harrington, Kimberly Butler, and S.A. Godinez and on Count 2 for unconstitutional conditions of confinement against Michael Atchison,

Richard Harrington, Kimberly Butler, Chad Hasemeyer, and Barbara Mueller. John Baldwin will remain in this action only to perfect any injunctive relief that may be granted.

**IT IS SO RECOMMENDED**

DATED: March 6, 2018

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**